**William PASCOE, Sr., Plaintiff,**

v.

**MENTOR GRAPHICS CORPORATION, Defendant.**

**No. Civ. 00–874–ST.**

United States District Court, D. Oregon.

Dec. 11, 2001.

Thomas M. Steenson, Zan E. Tewksbury, Steenson, Schumann, Tewksbury & Rose, P.C., Portland, Oregon, for plaintiff.

John F. Neupert, Melissa Lehane Rawlinson, Miller Nash, LLP, Portland, Oregon, for defendant.

## ORDER

KING, District Judge.

The Honorable Janice M. Stewart, United States Magistrate Judge, filed Findings and Recommendation on November 2, 2001. The matter is before this court. *See* 28 U.S.C. § 636(b)(1)(B) and Fed. R.Civ.P. 72(b). No objections have been timely filed. This relieves me of my obligation to give the factual findings *de novo* review. *Lorin Corp. v. Goto & Co., Ltd.,* 700 F.2d 1202, 1206 (8th Cir.1983); *See also Britt v. Simi Valley Unified School Dist.,* 708 F.2d 452, 454 (9th Cir.1983). Having reviewed the legal principles *de novo,* I find no error.

Accordingly, I ADOPT Magistrate Judge Stewart's Findings and Recommendation (# 80).

IT IS HEREBY ORDERED that Mentor Graphic's motion for partial summary judgment (# 25) is denied. Pascoe's oral motion for partial summary judgment as to the third claim for relief is granted for penalties *both* for violating ORS 652.140 and for violating *either* FLSA minimum wage provision or ORS 653.055, with the second penalty limited to whatever amount is greater under the FLSA or ORS 652.150 (the penalty provision for violating ORS 653.055).

## FINDINGS AND RECOMMENDATIONS

### INTRODUCTION

Plaintiff, William Pascoe, Sr. ("Pascoe"), a former employee of defendant, Mentor Graphics Corporation ("Mentor Graphics"), filed this action on June 23, 2000, and filed his First Amended Complaint ("Complaint") on July 28, 2000. Pascoe alleges claims against Mentor Graphics for: (1) age discrimination and retaliation in violation of both the Age Discrimination in Employment Act, 29 USC § 621, *et seq.* ("ADEA") and its state counterpart, ORS Chapter 659 (First and Second Claims for Relief); (2) wrongful discharge (Third Claim for Relief); and (3) failure to pay minimum wages in violation of the Fair Labor Standards Act, 29 USC § 201, *et seq.* ("FLSA") and state law, ORS Chapter 653, or to pay wages in a timely fashion under state law, ORS Chapter 653 (Fourth Claim for Relief).

This Court has jurisdiction pursuant to 28 USC § 1331 and supplemental jurisdiction pursuant to 28 USC § 1367. Mentor Graphics has filed a Motion for Partial Summary Judgment (docket # 25), seeking summary judgment against Pascoe's first three claims, and against his fourth claim to the extent it seeks recovery of more than one penalty under federal or state law. For the reasons stated below, the motion should be denied and Pascoe's oral motion for summary judgment on the wage claim penalties should be granted.

### ANALYSIS

#### I. *Legal Standard*

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630–31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988), citing *Matsu-*

*shita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

## II. *Facts*

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Pascoe. A review of the parties' submissions, including affidavits, declarations, and deposition excerpts,[1] reveals the following facts.

### A. *Pascoe's Positions With Mentor Graphics*

Pascoe was first employed by Mentor Graphics in November 1990 on a contract basis as a full-time technical writer. Pascoe Dec, ¶ 5. In 1991, he became a regular, full-time Technical Writer/Course Developer III (Senior Technical Writer). Plaintiff's Ex 103. He was promoted to the position of Technical Marketing Engineer II in January 1994 to the position of Program Manager in April 1998. Pascoe Dec, ¶ 5; Plaintiff's Ex 107. In April 1999, he was promoted to the position of Product Marketing Manager with the AMS Group. Plaintiff's Ex 113. The AMS Group is within the DSM division of Mentor Graphics. Chern Dec, ¶ 1. In June 2000, Mentor Graphics terminated his employment. At that time, he was 62 years old. Pascoe Depo, pp. 8–9.

### B. *Supervision by Karl Lange*

On April 15, 1999, Karl Lange ("Lange") was hired by Mentor Graphics as a Marketing Director and became Pascoe's fifth supervisor. At the time, Lange was 45

and Pascoe was 61 years old. Plaintiff's Ex 129; Pascoe Dec, ¶ 11.

Lange treated Pascoe differently than his younger co-workers because of his age by: (1) singling him out for criticism for minor errors, such as being a few minutes late for a meeting because Pascoe was on the phone with a customer, while younger employees who were 20–30 minutes late for the same meeting were not reprimanded; (2) publicly criticizing him in Grenoble, France, for matters that Lange knew were beyond his control; (3) threatening him with what would have been an undeserved poor performance review for 1999; (4) chastising him for not resolving a problem that had never been assigned to him for resolution, which, once assigned to him, he was able to resolve in about 30 minutes; (5) chastising him for being inaccessible to those in engineering, when he was accessible; (6) not giving him the authority necessary to handle a product's delivery and then unfairly criticizing him when he could not "make it happen;" and (7) denying him the opportunity to travel as much as was necessary to fulfill his duties. Pascoe Dec, ¶ 12.

In comparison, Gary Pratt ("Pratt"), whom Lange also supervised, was promoted by Lange to Technical Marketing Manager, got along with Lange, and never received any criticism by Lange. Pratt Depo (Plaintiff's Ex 146), pp. 3–7, 15. Pratt was 40 years old at the time Lange started working for Mentor Graphics. Plaintiff's Ex 129.

### C. *Mentor Graphics' Personnel Policies*

#### 1. *Discrimination Complaints*

Mentor Graphics has written personnel policies which prohibit any difference in

---

1. Excerpts from affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and cita- tions are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript.

treatment, *i.e.*, discrimination or harassment, on the basis of age. Plaintiff's Exs 133, 134. One of those policies states Human Resources ("HR") should investigate any discrimination or harassment complaint when made directly to HR. *Id.* Mentor Graphics' Employee Relations Director, Ryan Kenney ("Kenney"), along with certain other Mentor Graphics' employees, has responsibility for investigating or directing the investigation of age discrimination complaints. Kenney Depo, p. 30.

Mentor Graphics has another written personnel policy to handle internal complaints of discrimination or harassment to HR. Plaintiff's Ex 135. An HR Consultant starts a confidential and expedited fact-finding process which includes obtaining a statement of the complaint, gathering data and evaluating the situation. The investigation, the results, and any action taken must be documented and communicated to the complainant. *Id;* Kenney Depo, pp. 38–42.

### 2. *Performance Reviews*

Mentor Graphics also has a written personnel policy outlining procedures for providing annual written Performance Reviews for its employees. The policy sets forth the following steps:

a. Manager establishes performance criteria for employee.

b. Manager generally communicates performance criteria to employee at the beginning of a review period.

c. Manager obtains employee's input on accomplishments and performance.

d. Manager clarifies input with employee, particularly when there are differences.

e. Manager collects feedback on employee performance and achievements from peers, direct reports, matrix managers, etc., as given by employee and others chosen by manager.

f. Manager prepares "draft" Performance Review, prepares Ranking Summary Worksheet, and participates in Ranking Session.

g. Manager follows-up and clarifies any new information obtained on employee during the ranking session.

h. Manager finalizes the Performance Review.

i. Manager reviews the completed Performance Review with Second Level Manager and Matrix Manager, where appropriate, and obtains necessary signatures.

i. Manager delivers Performance Review to employee and discusses it with him.

j. If employee rates "Does Not Meet Minimum Expectations" or "Needs Improved Consistency" as one option, a Performance Improvement Plan may be developed, with Human Resources Center ("HR"), and delivered to the employee at the time of the review.

k. Manager returns completed, signed original Performance Review to the coordinating AA, who forwards to HR Central for data entry and corporate filing.

Plaintiff's Ex 130; Pascoe Dec, ¶ 7.

Assuming an employee has been shown and is aware of a Performance Review and disagrees with it, the employee can go to HR and file a grievance or contest the review. Koeroghlian Depo, p. 57. As discussed below, a Performance Review ("the 1999 Performance Review") of Pascoe was initiated in approximately March 2000 by a member of Mentor Graphics' HR department. As also discussed below, despite the fact that Pascoe's 1999 Performance review was never finalized, the information

contained in it made its way into the Re-balance Plan that resulted in Pascoe's termination. Pascoe did not learn of the existence of the 1999 Performance Review until he received it in discovery in this case. Pascoe Dec, ¶ 23.

### 3. *Performance Improvement Plans*

Mentor Graphics has written personnel policies regarding Performance Feedback and Coaching which may, if appropriate, lead to the use of a written Performance Improvement Plan. Plaintiff's Exs 131, 132 (bate stamped: 20000330–20000336, 20000364–20000370). According to Kenney, those policies are "tools to be used so that the employee can be provided a fair and equitable work environment." Kenney Depo (Plaintiff's Ex 143), pp. 4–6, 24. If approached, Kenney will assist managers in preparing a Performance Improvement Plan to assist an employee who develops performance problems after the first three months of the fiscal year. *Id* at 4–6, 24–26. Pascoe was never placed on such a plan. Pascoe Dec, ¶ 9.

### D. *Pascoe's Complaints of Age Discrimination by Lange*

On December 8, 1999, Pascoe met with Kenney to discuss the problems he was having with Lange. Before the meeting, Pascoe sent Kenney an e-mail that outlined his concerns. Kenney Dec, ¶ 2; *see* Plaintiff's Ex 115 (Pascoe Depo, Ex 16). Pascoe complained to Kenney that he was being treated differently or discriminated against by Lange because of his age. Pascoe Depo, p. 65. In response to Pascoe's concerns about his upcoming 1999 Perfor-mance Review, Kenney told Pascoe not to worry because Mentor Graphics had personnel policies which require a supervisor to give advance notice to subordinates who are having performance problems, to provide feedback, coaching, and, if necessary, to put the employee on a Performance Improvement Plan prior to giving the employee a negative evaluation. He also told Pascoe that HR had received no information about his 1999 performance, and more particularly had received nothing to suggest that Pascoe had been performing poorly. Pascoe Dec, ¶ 13. Kenney was never contacted by Lange or anyone else seeking to place Pascoe on a Performance Improvement Plan, nor did anyone ever allege that Pascoe had any performance problems during the last few years of his employment. Kenney Depo, pp. 5–6, 29–30.

In February 2000, Pascoe also informed Lange's supervisor, Joel Alanis–Rodriguez ("Rodriguez"), that he had made an age discrimination complaint to Kenney against Lange. Pascoe Dec, ¶ 17.[2] By March 31, 2000, Rodriguez left Mentor Graphics. Plaintiff's Ex 167.

### E. *Hiring of Jue–Hsien Chern and Henry Chang*

In January 2000, Mentor Graphics hired Jue–Hsien Chern ("Chern") as the General Manager of Mentor Graphics' DSM Division, including the AMS Group. Chern Depo, p. 12. At that time, Chern was 45 years old. Chern Depo (Plaintiff's Ex 139), pp. 7, 12, 27. By that time, Pascoe had been working for Mentor Graphics for approximately nine years and in the AMS

---

**2.** Mentor Graphics argues that this statement is inconsistent with Pascoe's deposition testimony. However, Pascoe's testimony that he told Rodriguez that he was not getting along with Lange and that was "about the extent of the conversation" was in response to a question about whether Pascoe had any discus-sions with Rodriguez about the problems he had experienced with Lange. That testimony is not inconsistent with the statement in his declaration that he "informed ... Rodriguez about his age discrimination complaint." Pascoe Depo, p. 72.

Group for approximately six years. Pascoe Dec, ¶ 18.

In early 2000, sometime after Chern's hiring, a decision was made to terminate Lange due to poor performance. The decision to remove Lange was based, at least in part, upon a statement he made to Pascoe regarding his age. Mendes-daCosta Depo (Plaintiff's Ex 145), pp. 17–24, 26–27.

On March 15, 2000, Chern hired Henry Chang ("Chang") to replace Lange as the Marketing Director for the AMS Group and became Pascoe's supervisor. Chang Depo, p. 5. At that time, Chang was 37 years old. Plaintiff's Ex 129; Chang Depo, p 18. Chern had worked previously with Chang, his friend, and had recruited him to join Mentor Graphics. Chern Depo, pp. 113–114.

### F. *Pascoe's Performance Reviews*

#### 1. *1991–1998*

Pascoe received annual Performance Reviews from 1991 through 1998 from four different managers who supervised him during that time: Jeff Tidd (3 evaluations), Doug Lundin (2 evaluations), John Ott (1 evaluation), and Ariel Cao ("Cao") (3 evaluations, including 1996–1998). In those evaluations, Pascoe consistently received rankings of "Consistently Exceeds" or "Consistently Meets" all performance or peer performance levels. Plaintiff's Exs 104–112. He never received one of the lower rankings such as "Needs Improved Consistency" ("NIC") or "Does Not Meet Minimum Expectations."

#### 2. *January 2000 Ranking Meeting*

Linda Christianson ("Christianson") is a Mentor Graphics' Business Partner of Organizational Design and Organizational Development, responsible for helping sen-

ior management review their organizational structures. Christianson Depo, p. 5. Some time after Chern was hired, Christianson attended a meeting in Wilsonville, Oregon, *during the first quarter of 2000*,[3] with Senior Vice–President Don Guiou ("Guiou"), Rodriguez, Rob Mendes-daCosta ("Mendes-daCosta"), Ernie Koeroghlian ("Koeroghlian"), and possibly other managers (but not Chern). *Id* at 21–22; Mendes-daCosta Depo, p. 23. The meeting ranked the performance of Guiou's subordinates. Christianson Depo, p. 22. During the meeting, Christianson learned from either Rodriguez or Mendes-daCosta that Lange may have made a derogatory remark towards Pascoe about his age. Christianson Depo, pp. 20–23, 25. Mendes-daCosta confirmed that he raised the issue by stating that he had heard from one of Lange's employees that Lange had made a statement to Pascoe about Pascoe's age. Mendes-daCosta Depo, pp. 22–23. After the meeting, Christianson told Kenney about what she had heard. Christianson Depo, pp. 25–26.

Later that same day at a second meeting to rank Lange's subordinates, Pascoe's 1999 job performance was discussed. Mendes-daCosta Depo, p. 25. Lange may or may not have been present. *Compare* Mendes-daCosta Depo, p. 25, *with* Koeroghlian Depo, pp. 36–37. When it was suggested that Pascoe should receive a NIC ranking for 1999, Mendes-daCosta recalled that since Pascoe "had such poor management at that time and given these comments [by Lange about Pasco], I thought it was not in the best interest of the company to—apply a low ranking as such." Mendes-daCosta Depo, p. 29. Mendes-daCosta stated that Pascoe's "performance review should be increased" because his performance was "as much a

---

**3.** There is some indication that the meeting took place on January 27, 2000. In any event, it was prior to Lange's termination. Mendes-daCosta Depo, p. 24.

reflection of [Lange's] lack of management [as anything else] and also a potential lawsuit risk based on the comments I heard to basically position Bill Pascoe in a not meets category." *Id* at 32. As a result, Mendes-daCosta believed the "plan of action" was to adjust Pascoe's ranking upward, but he does not know if that actually occurred. *Id* at 32–33, 35. Contrary to Mendes-daCosta's understanding of the consensus reached at the meeting, Koeroghlian testified that he learned during that same meeting that Pascoe should receive an NIC ranking for 1999. Koeroghlian Depo, pp. 35–37.

### 3. *The 1999 Performance Review*

#### a. *Koeroghlian's Insolvent*

Koeroghlian is a Group Manager and the Business Unit Director for the Custom IC Design Business at Mentor Graphics. Koeroghlian Depo (Plaintiff's Ex 144), pp. 3–5. By the end of 1999, Koeroghlian had heard of problems between Pascoe and Lange, but does not remember who exactly said what. Koeroghlian did not learn of Pascoe's December 1999 complaint about Lange to Kenney until after Pascoe filed this lawsuit. *Id* at 22.

Sometime in January through May 2000, and probably in early March 2000, Christianson asked Koeroghlian to gather data and document Pascoe's 1999 job performance. *Id* at 31–32, 44. Because it was not a high priority for Koeroghlian, Christianson had to ask him a few times to get it done. *Id* at 34.

A manager typically only evaluates those employees the manager directly manages. *Id* at 10. In his previous position as an Engineer Manager, Koeroghlian evaluated approximately 75 subordinates. *Id* at 9. Consistent with the personnel policy at Mentor Graphics, Koeroghlian always gave his subordinates the opportunity to review the written Performance Review, sign off, and offer comments. Likewise, his direct managers have always given him that same opportunity. *Id* at 26–27.

Koeroghlian has never supervised or managed Pascoe in any way, although he did occasionally work with Pascoe in parallel groups. *Id* at 10–11. Before 2000, Koeroghlian was never managed by Lange and was never asked by Lange or anyone else at Mentor Graphics to contribute to a review of Pascoe's job. *Id* at 12.

In preparing Pascoe's 1999 Performance Review, Koeroghlian did not review Pascoe's personnel file, or any other documents concerning Pascoe's job performance, and knows nothing about Pascoe's history of strong performance, lack of discipline, merit pay increases, and receipt of bonuses. *Id* at 16, 21–22. Koeroghlian only remembers speaking to one or possibly two people about Pascoe: Product Marketing Manager Dorine Szij, who was in Koeroghlian's (not Pascoe's) group, and Rodriguez. Koeroghlian cannot remember what Szij told him and Rodriguez never got back to him. *Id* at 16–20. In preparing the 1999 Performance Review, Koeroghlian acted as a "recording secretary." *Id* at 55. Koeroghlian gave the 1999 Performance Review to Christianson. *Id* at 55.

Neither Lange (Pascoe's direct manager for most of 1999) nor Cao (Pascoe's direct manager from 1996–1998) were asked to contribute to Pascoe's 1999 review. Pascoe was not notified of the review or allowed any input into the review. The review is incomplete and unsigned. Hinkley Depo (Plaintiff's Ex 142), pp. 4–6, 18–19; Kenney Depo, pp. 67, 71–72, 116. Pascoe contends that it is also a false ranking of his job performance for that year. Pascoe Dec, ¶ 22.

#### b. *Lange's Subordinates*

At the time Chang replaced Lange, Lange supervised nine persons, including

Pascoe, Ken Bakalar ("Bakalar") (a Program Manager located in Rockville, Maryland), Pratt (a Technical Marketing Manager located in Schaumburg, Illinois), Michael Walton ("Walton") (a Product Marketing Manager located in Dallas, Texas), Bill Barrett ("Barrett") (a Product Marketing Manager located in Wilsonville, Oregon), and Hany El–Hak ("El–Hak") (a TME located in Egypt). Chang Depo, pp. 10–11; Pascoe Dec, ¶ 24; Plaintiff's Ex 129.

Other than Pascoe, Barrett was the only Lange subordinate who received a Performance Review for 1999. Plaintiff's Exs 153–157, 165–167. Barrett was shown and signed off on his review on March 31, 2000. Plaintiff's Ex 167. Barrett was 38 years old at that time. Plaintiff's Ex 129.

Walton, whose position was eliminated at the same time in 2000 as Pascoe's (Plaintiff's Ex 120), had been the subject of an earlier rebalance in late 1998, but was rehired in early 1999. Plaintiff's Exs 149, 150. Walton did not receive a Performance Review for 1999. Pascoe Dec, ¶ 24; Plaintiff's Exs 148, 156. Pratt's performance also was not evaluated for 1999. Pratt Depo, pp. 3–6, 18–19; Plaintiff's Ex 155.

### G. *The Decision to Eliminate Pascoe's Position*

Shortly after he was hired in January 2000, Chern decided to reorganize the divisions under his control, including the AMS Group to make it function more like a start-up corporation. Chern Dec, ¶ 2. Chern concluded that products were doing well in Europe but not in the United States. Chern Depo, pp. 29–30. In order to assess the individuals he supervised, Chern obtained a list of employees in the groups he supervised and in February 2000 went to France and Egypt to interview employees. *Id* at 39. While in France, he concluded that he needed to reduce the number of Mentor Graphics products, combine some of the product-marketing functions, eliminate three of six product marketing positions, and add Technical Marketing Engineer ("TME") positions. *Id* at 39, 75, 79–80; Chern Dec, ¶ 3.

When he returned to the United States, Chern learned that one product-marketing manager had moved to another department. Chern Depo, p. 79. Therefore, only two positions within the AMS Group needed to be eliminated and Chern chose one in Wilsonville, Oregon (held by Pascoe) and one in Dallas, Texas (held by Walton). *Id;* Chern Dec, ¶¶ 3–4. He decided to eliminate Pascoe's position because Pascoe was working on two products, one of which (AccuParts®) had come to the end of its productive life, and the other of which (CommLib) was not a matured, standard product and therefore did not need a project manager. *Id,* ¶ 3. At that time, Chern knew that one of the positions to be eliminated was occupied by Pascoe, but he had not yet met Pascoe and did not know his age. Chern Depo, pp. 47, 59, 91–92. In mid-February 2000, Chern met with Christianson to discuss the restructuring of the AMS Group. Chern then spent time interviewing all of the people who were working within his division. Chern Depo, p. 39.

Pascoe had two conversations with Chern regarding his employment before learning on May 12, 2000, that he was being terminated. Pascoe Dec, ¶ 19. In their first conversation by telephone, Chern seemed pleasant enough and asked Pascoe to prepare a written presentation setting forth what he was doing for Mentor Graphics in his current position. *Id.* At that time, Chern had no reason to believe that Pascoe had just turned 62 or was an older employee. *Id.*

Chern and Pascoe later spoke in person. Although the record is not clear, this meeting likely occurred after Chern's return from France and April 19, 2000, the date of the draft Rebalance Plan, discussed below. Pascoe looks his age, having thinning white hair, an aging face, and a white beard. When Pascoe walked into Chern's office, Chern looked shocked and surprised. Chern was hostile towards Pascoe and at several points turned his back on Pascoe. Chern treated Pascoe much differently than he had on the telephone which Pascoe attributes to Chern's discovery of his age. Pascoe Dec, ¶ 19. In contrast, Pratt was not treated any differently when he first met Chern in person as compared to how Chern had treated him previously on the phone. Pratt Depo, pp. 27–28.

### H. *The Rebalance Plan*

Chern, Christianson, Kenney, Hansen, and others were involved in generating the Rebalance Plan that led to the Pascoe's termination. *Id* at ¶ 6; Plaintiff's Exs 117–20. On or about February 29, 2000, at the request of Christianson, an HR employee, Dayna Lyons ("Lyons"), prepared a Rebalance Summary Sheet which would result in the elimination of Pascoe's position. Plaintiff's Ex 117; Kenney Depo, pp. 77–78.

The record contains little evidence about what took place during the six weeks following preparation of the Rebalance Summary Sheet. However, it appears that in early March 2000, shortly after Lyons completed the Rebalance Summary Sheet, Christianson asked Koeroghlian to complete a 1999 Performance Review of Pascoe, and that some time prior to April 19, 2000, Koeroghlian gave the 1999 Performance Review to Christianson. Koeroghlian Depo, pp. 31–32, 44.

After receiving the Rebalance Summary Sheet and after Chang's arrival on March

15, 2000, Kenney spoke with Christianson by telephone and wrote notes on his copy. Plaintiff's Ex 117; Kenney Depo, pp. 77–81. His notes indicate that Pascoe had been reporting to Chang, that Christianson told Kenney that Pascoe had received a "[t]wo rating which corresponds to the most recent rating of NIC, and that there was an 'age issue with Karl [Lange] as manager.'" Kenney Depo, pp. 81–85. Kenney asked Christianson no questions about what she told him concerning the age issue and did not investigate it. He only wrote it down because Christianson wanted to meet with him later about the age issue. *Id* at 85–87.

On April 19, 2000, Christianson sent an e-mail to Kenney and Hansen, with a copy to Chern, stating that Chern had "recently revisited" the list of "roles [he earlier] thought to be **not** needed." Plaintiff's Ex 118 (emphasis in original). Christianson attached to the e-mail a draft of the "proposed rebalance language," which stated in part: "As you both may know there are a few unusual nuances related to these two roles and people [Pascoe and Walton]: *** *with anecdotal information that* says there is a red flag related to age discrimination towards [Pascoe] *** [and] the two incumbents represent age [Pascoe] and race [Walton] affirmative [sic] action classes." Plaintiff's Ex 118, p. 2 (emphasis in original). Christianson testified that the reference to a "red flag related to age discrimination" was a reference to the information she had learned at the January 2000 ranking session, described above. Christianson Depo, p. 27.

The e-mail also states that Christianson would share "via voice mail:" (1) data regarding "some background work that was needed during the Focal process due to the departure of both [Rodriguez] and [Lange]" and (2) information "about where I have floated the prospect of placement of

one of the incumbents." Plaintiff's Ex 118. Chern received the April 19, 2000 e-mail, but testified that he only read the e-mail and the "business case" portion, but not the "personnel" portion which referenced Pascoe's age discrimination complaint. Chern Depo, pp. 99–101.

On April 20, 2000, Christianson informed Kenney that Chern had determined that there was no alternative role within the AMS Group for which Pascoe could be considered. Plaintiff's Ex 151; Kenney Depo, pp. 107–109.

Chern, assisted by Kenney and Juie Fadling, prepared a confidential draft of an April 21, 2000 memorandum titled "DSM, AM/S Division—Employee Rebalance Plan." It states in part:

> The two incumbents *represent age and race affirmative action classes*.... Mr. Pasco [sic]'s last focal performance review rating (1999) was "Needs Improved Consistency." I have been made [sic] Mentor Graphics typically does not provide an employee with 'NIC' rating the opportunity to search internally in the event their position is eliminated. However, I believe the lack of effective management and direction received by Mr. Pasco [sic] may have contributed to his weak performance during the prior period and advocate that he be afforded the usual opportunity to seek other roles at MGC. *I am not optimistic he will secure a new role with MGC.*

Plaintiff's Ex 119 (emphasis added).

Chern and others signed the final version of the Rebalance Plan at the end of April 2000. Plaintiff's Ex 120; Chern Depo, Ex 29. It provided that Pascoe would be "afforded the usual opportunity to seek other roles at [Mentor Graphics]" and stated that staffing had been "requested to closely monitor all open requisitions for a possible fit" and that a "designated member of the staffing team will work directly with ... Pascoe regarding [his]

internal search for suitable positions." Plaintiff's Ex 119, p. 2. That version did not include the sentence stating "I am not optimistic [Pascoe] will secure a new role with MGC," but did state that Pascoe's "last focal performance review rating (1999) was 'Needs Improved Consistency.'" Plaintiff's Ex 120, pp. 1–2.

### I. *Pascoe's Termination*

On May 12, 2000, in a video conference with Chern, Kenney, Christianson, and Pascoe, Chern informed Pascoe that his position would be eliminated as of June 12, 2000. Plaintiff's Ex 121; Pascoe Dec, ¶ 27; Chern Dec, ¶ 8. At the time of his termination, Pascoe was the oldest employee working under Chern and Chang. Pascoe Dec, ¶ 27.

### J. *Efforts to Find Another Job*

Once Pascoe learned of his pending termination, he actively pursued approximately 20 new positions at Mentor Graphics for which he believes he was qualified. Pascoe Dec, ¶ 29. Pascoe's vocational expert Richard J. Ross, who analyzed Pascoe's skills, aptitudes, and abilities, opines that Pascoe "was a qualified candidate for several TME positions which were, or became, available at or about the time he was terminated from Mentor Graphics." Plaintiff's Ex 52.

#### 1. *"Proactive" Rehiring of "Rebalanced" Employees*

Hansen supervises internal and contract recruiters for Mentor Graphics who work with employees whose positions are being eliminated to help find a new position with the company. Hansen Depo (Plaintiff's Ex 141), pp. 4, 6–7, 13–15. In four years, Hansen was involved in approximately 15 to 20 rebalances at Mentor Graphics. Hansen Depo, p. 41. She has become increasingly "proactive" in finding employ-

ees new positions within Mentor Graphics. Of those employees whose positions were eliminated, Hanson guesses about 50% found new positions within the company, and the other 50% found more suitable employment externally. *Id* at 40–41. Kenney agrees that "[a]s a matter of practice or history within the company, internal candidates move more frequently within the company than we hire external candidates ahead of [them]." Kenney Depo, p 59. That happens because the "current employee is a known entity [and] they're local so it doesn't require a signing bonus, a relocation fee." *Id.*

Hansen had a meeting with Kenney and Christianson to discuss the plan to eliminate Pascoe's position. She was told that Pascoe had received a bad 1999 Performance Review unlike his previous reviews, and that Pascoe had complained about his former manager, Lange, discriminating against him on the basis of his age. *Id* at 29. Hansen's response was that when one year's worth of poor performance with a new manager, which digressed from prior years of good performance, might just be a mismatch with the manager, making it her job to find the person a right match. *Id* at 33. However, Hansen did "nothing" to assist Pascoe in finding a new position with the company. *Id* at 47.

Kenney testified that he did not know until just before his deposition on January 11, 2001 that Pascoe's 1998 Performance Review gave him a rating of a four or "Consistently Meets Peer Performance" and that his 1999 Performance Review was not complete. Kenney Depo, pp. 84–85. Kenney admits that a NIC ranking might have some bearing on whether Pascoe found a new position if hiring managers knew about it. *Id* at 89.

#### 2. *Interactions with Buck Byrum*

On May 18, 2000, Pascoe sent an e-mail to Buck Byrum ("Byrum"), an internal recruiter with Mentor Graphics. Plaintiff's Ex 122. In that e-mail, Pascoe identified 10 positions he felt "fit [his] experience," and asked for the "details (hiring manager, etc.)" for those positions. *Id.* The e-mail also identified an additional 11 positions that Pascoe considered to be "possibilities." *Id.*

After receiving the e-mail and later speaking with Pascoe by telephone, Byrum concluded that Pascoe was "pretty disgruntled" because he "feels like he is qualified for [the positions he identified] yet there is no activity." Byrum Depo, pp. 38–39. Byrum interpreted Pascoe's frustration as stemming from the fact that "he was not getting conversations set up, he was not being evaluated for these positions." *Id* at 39. Byrum did not ask for Pascoe's resume, determine Pascoe's experience or strengths, try to find open positions for which Pascoe was qualified, or contact any hiring managers on behalf of Pascoe. Instead, he simply provided Pascoe the identity of some of the hiring managers and suggested that Pascoe contact the hiring managers himself. Pascoe Dec, ¶ 30; Byrum Depo, pp. 20–21.

While Pascoe was still employed, Hansen spoke one time with Byrum and checked on how things were going with Pascoe. Byrum did not report Pascoe's disgruntlement or the problems he was having with getting evaluated for a new position, although Byrum did tell Hansen that Pascoe was having one problem, namely the fact that "he had been around a long time at Mentor." Hansen Depo, p. 20. Hansen gave Byrum no advice or assistance, and Byrum did not devote any special attention to finding a job match for Pascoe. *Id* at 18–23, 39–40.

#### 3. *TME Position in Pratt's Group*

Independent of Byrum, Pascoe communicated with several hiring managers at

Mentor Graphics, including Gary Pratt, Sanjay Dhar ("Dhar"), Fred Cohen, Darcy McCallum, Steve Shively, Mendes-daCosta, and Koeroghlian, about new positions for him. As discussed below, Pascoe expressed interest in, but was not offered, a new TME position which was to report to Pratt.

Before Chern took over, and while Lange was still Pratt's supervisor, Pratt told Lange that he would like to have Pascoe working for him as a TME in the United States. Pratt Depo, pp. 42–43. At that time, El–Hak (in Egypt) was the only TME for the AMS Group. *Id* at 43. The AMS Group was expanding and needed another TME in the United States. *Id.* By the time Chern took over, there were two TME openings in the United States. Plaintiff's Ex 128; Pratt Depo, pp. 25, 30–33.

During a May 15, 2000 conference call between Chang (to whom Pratt reported at the time, Pratt Depo, p. 7) and members of Pratt's team, it was announced that Pascoe had been terminated. First Bakalar, and then the other members of the team who were on the call, expressed agreement that Pascoe should have been transferred to Pratt's group. Pratt testified that Chang was "speechless" and surprised at what he heard. *Id* at 47–51, 59; Plaintiff's Ex 123 (5/17/00, 12:57 PM e-mail from Pratt to Pascoe). Pratt then sent Chang an e-mail because he "wanted to know where to go from there and how to proceed to hire [Pascoe] for the open TME position." Pratt Depo, p 52. As stated in the e-mail, "[a]s you heard on the Monday morning conference call, the entire team feels that Bill Pascoe is the best candidate we could possibly find to fill the open TME spot. How do we handle this? Should I contact Bill? Please advise." Plaintiff's Ex 123 (5/17/00, 7:51 AM e-mail from Pratt to Chang). Chang admits learning from

Pratt in that meeting that "Bill Pascoe could be a good TME." Chang Depo, p. 28.

Chang responded by asking Pratt to find out if Pascoe was interested in the position. Plaintiff's Ex 123 (5/17/00, 2:43 PM e-mail). Pascoe responded to Pratt that he was. *Id* (5/17/00, 12:57 PM e-mail). After Pratt notified Chang of Pascoe's interest, Chang then responded with another e-mail (*id*, 5/17/00, 1:41 PM e-mail) stating "I personally feel that [Pascoe] does not have the motivation and energy level to be proactively involved in customer issues. He is probably very knowledgeable, but he may not be a good problem solver." *Id* at 3. Chang then went on to discuss some of the functions of the TME position and concluded by stating "I just don't feel Bill can do it. Please correct me if this is just my bias." *Id.*

Chang heard from someone at Mentor Graphics—probably Koeroghlian or John Gelsey—that Lange believed Pascoe was "too old to do anything." Chang Depo, pp. 19–20, 22. When asked whether that comment concerned him, Chang responded that "I certainly would put that into account, but I—that's only one piece of information, and I—at that time I was in the process to collect all information regarding to my—to my team." *Id* at 36. Before he learned of his termination, Pascoe had a face-to-face conversation with Chang about what he did for Mentor Graphics. During that meeting, Chang admits that he saw Pascoe's white hair and white beard and "of course" thought Pascoe was older than he. *Id* at 18–19.

In two additional e-mails (Plaintiff's Ex 123, pp. 3–4, 9:54 PM and 12:22 PM e-mails), Pratt informed Chang that Pascoe was "interested" in the position and that "a choice between [Pascoe] and Fouad [M'Kalech]; or [Pascoe] and a new-hire with no Mentor experience would be quite easy to make"—*i.e.*, Pascoe should be hired.

Pratt Depo, pp. 55–56. Chang responded only that he did not know "if [he could] convince Jue–Hsien [Chern]" to hire Pascoe for that position. Plaintiff's Ex 123, p. 3, 5/17/00, 2:51 PM e-mail.

Chern admits that Chang spoke to him about the TME position in May or June 2000 and told him of Pratt's recommendation. He told Chang it was his decision whether to offer Pascoe the position. Chern did not know why Chang would have told Pratt that he needed to convince Chern if Pascoe was going to get a new position. Chern Depo, pp. 137–138, 141–142.

Chang decided not to hire Pascoe because he had a concern about Pascoe's trustworthiness and work ethic arising from expense reports that violated company policy. Chang Depo, pp. 51, 54–55. He informed Chern that he did not want Pascoe in his group for that reason. *Id* at 50, 58. He also informed Pratt about his decision not to let Pratt hire Pascoe. *Id* at 48. However, Pratt testified that he never heard back from Chang, Chern, or anyone in HR about Pascoe not being offered the position or why. Pratt Depo, p. 61.

On April 19, 2000, Fouad M'Kalech ("M'Kalech"), who had been working in France as a quality analysis engineer, was offered employment as a TME in San Jose. Plaintiff's Ex 160. Chang and Chern approved the offer, and M'Kalech began working in San Jose in September 2000. Plaintiff's Ex 161. At that time, M'Kalech was 26 years old. M'Kalech later was transferred into a TME position back to France, and an external applicant, Christian Mayer ("Mayer"), was hired to fill the TME position in San Jose. Mayer was 27 years old. Plaintiff's Exs 158, 162. Pascoe believes he was more qualified for the TME positions than either M'Kalech or Mayer.

### 4. *TME Position with Dhar*

In early April 2000, Dhar, who worked under Chern, told Chang that Pascoe would be a good TME and that he would welcome Pascoe to the TME position Dhar had open at the time. When Chang later learned that Pascoe was losing his position, Chang did not advise Dhar that Pascoe needed a job and was available to fill the open TME position. Chang Depo, pp. 43–44.

Pascoe also worked with Tanja Youngs ("Youngs"), a contract recruiter in California working for Mentor Graphics who recruited for Chern, Chang, and Dhar. *Id.*, ¶ 34; Youngs Depo (Plaintiff's Ex 147), pp. 5–6, 7–8, 15. Youngs contacted Pascoe about Dhar's open TME position, informed Dhar of Pascoe's availability, and sent Pascoe's resume to Dhar. In response, Dhar expressed interest in hiring Pascoe. *Id* at 16–17. Pascoe informed Youngs that he was concerned that Chern would veto any position for him in Chern's group and asked Youngs to tactfully explore it with Chern. Youngs then communicated with Chern about Pascoe getting the position in Dhar's group. Chern e-mail response was "I'm surprised he's back. I let him go." *Id* at 20–21. Later, Chern told Youngs that he wanted to "upgrade." *Id* at 22. Youngs apologized to Pascoe telling him that she was sorry for any inconvenience she might have caused because she didn't realize he was previously in Chern's group. *Id* at 22; Plaintiff's Ex 125.

Ossah Chan ("Chan") was hired for the TME position in Dhar's group. Plaintiff's Ex 170. At that time, Chan was 35 years old. Plaintiff's Ex 172. Chan had been in a TME position earlier at Mentor Graphics and had worked with Pascoe. However, Chan had been terminated for poor performance by their supervisor at the time, Cao (Pascoe's direct manager from 1996–1998). Pascoe believes he was more qualified than

Chan for the position in Dhar's group. Pascoe Dec, ¶ 35.

### K. *Whether Pascoe's Position Was In Fact "Eliminated"*

As Product Marketing Manager, Pascoe was involved with the CommLib product. CommLib was the "cornerstone" of Chern's new strategy, and Chern was aware that Pascoe had been assigned to CommLib. Chern Depo, p 137. On May 18, 2000, Cao (Pascoe's direct manager from 1996–1998) sent an e-mail message to Chern inquiring who was replacing Pascoe as the product manager for the behavioral library. Plaintiff's Ex 124. Chern asked Chang to respond. *Id.* Chang responded with an e-mail directed at both Cao and Chern stating "We are trying to relocate Hany [El–Hak] to San Jose office. Hany [El–Hak] will be the one who pick [sic] up the CommLib support in US." *Id.* El–Hak is in his mid–30's.

As it turned out, El–Hak did not actually accept the position and did not relocate. Instead, the libraries were given to Program Manager Bakalar, a Mentor Graphics employee located in the Rockville, Maryland office. Pratt Depo, p. 37. Chang gave the assignment to Bakalar in the second half of 2000. Pratt Depo, pp. 37–38. Bakalar is 51 years old. Plaintiff's Ex 129.

### III. *Age Discrimination and Wrongful Discharge Claims*

Mentor Graphics argues that Pascoe can neither establish a *prima facie* case nor sufficiently counter the legitimate reasons Mentor Graphics has proffered for the actions it allegedly took against him. Thus, Mentor Graphics argues that it is entitled to summary judgment against Pascoe's federal and state age discrimination and retaliation claims (First and Second Claims), and wrongful discharge claim (Third Claim). Because these claims in-volve the same facts, they are analyzed together.

### A. *Substantive Legal Standards*

#### 1. *Age Discrimination Claims*

##### a. *ADEA*

■ The ADEA makes it unlawful for an employer to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age. 29 USC § 623(a)(1). Protection under the ADEA extends to all individuals who are at least 40 years old. 29 USC § 631(a). The Ninth Circuit analyzes ADEA cases using the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for reviewing claims brought under Title VII of the Civil Rights Act of 1964. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141–42, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (collecting cases from other circuits); *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 917 (9th Cir.1996), *cert denied,* 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997); *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 456 (9th Cir.1995).

■ A plaintiff may establish a *prima facie* case of age discrimination by demonstrating that he: (1) belongs to a protected class; (2) was performing his job satisfactorily; (3) was discharged; and (4) either (a) was replaced by a substantially younger person with equal or inferior qualifications, or (b) if the plaintiff was discharged as part of a reduction of the work force, that the discharge occurred under circumstances giving rise to an inference of age discrimination. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Washington v. Garrett,* 10 F.3d 1421,

1433–34 (9th Cir.1993). An inference of discrimination can be established either by showing that the employer had a continuing need for the plaintiff's skills and services in that his various duties were still being performed, or by showing that substantially younger employees were treated more favorably. *O'Connor,* 517 U.S. at 312–13, 116 S.Ct. 1307 (1996) (holding that a *prima facie* case does not require proof of replacement by someone not in the protected class and noting that better treatment of someone "substantially younger," rather than someone "outside the protected class," is a "far more reliable indicator of age discrimination)"; *Nidds,* 113 F.3d at 917.

■■■ The requisite degree of proof necessary to establish a *prima facie* case for a Title VII or an ADEA claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994). "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.' ... Establishment of a *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id* (citations omitted). Once plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating some permissible reason for the adverse action. *Id.* "Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the ... presumption of unlawful discrimination 'simply drops out of the picture.'" *Id,* citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At that point, a plaintiff can avoid summary judgment simply by producing evidence which raises a genuine issue of material fact regarding the truth of the employer's proffered reasons:

> As the Supreme Court recently reaffirmed, a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons.... While the plaintiff always retains the burden of persuasion, ... he does not necessarily have to introduce "additional, independent evidence of discrimination" at the pretext stage.

*Chuang v. University of California Davis, Bd. of Trustees,* 225 F.3d 1115, 1127 (9th Cir.2000), quoting *Reeves,* 530 U.S. at 149, 120 S.Ct. 2097 and citing *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742 (additional citations omitted).

Specifically, the plaintiff simply must produce enough evidence to allow a reasonable fact-finder to conclude either that: (a) the proffered reason for discharge is false, or (b) the true reason for his discharge was a discriminatory one. *Nidds,* 113 F.3d at 918. If the plaintiff offers direct evidence of discriminatory motive, a triable issue on the actual motivation is created "even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir.1998). The plaintiff may also offer circumstantial evidence that tends to show that the proffered motive is a pretext because it is inconsistent or unbelievable. The Supreme Court has clarified that "because a *prima facie* case and sufficient evidence to reject the employer's explanation may permit a finding of liability, [a court may not proceed] from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves,* 530 U.S. at 149, 120 S.Ct. 2097.

### b. *ORS Chapter 659*

█ Oregon law also prohibits age discrimination, but extends protection to individuals over the age of 18. ORS 659.030(1)(a) & (b). Oregon's standard for establishing a *prima facie* case of discrimination is identical to that under federal law. *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657, 719 P.2d 1322, 1324, *rev denied*, 302 Or. 35, 726 P.2d 934 (1986). However, Oregon courts have rejected the *McDonnell Douglas* burden-shifting. *Callan v. Confederation of Oregon Sch. Admin'rs*, 79 Or.App. 73, 77, 717 P.2d 1252, 1254 (1986).[4] Thus, where a plaintiff introduces evidence showing that his discharge took place under circumstances giving rise to an inference of unlawful discrimination, and thereby "establishes a *prima facie* claim of ... discrimination, summary judgment is inappropriate even in the face of assertions by the defendant of nondiscriminatory action." *Hardie v. Legacy Health Sys.*, 167 Or.App. 425, 437, 6 P.3d 531, 538 (2000), citing *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1232 (9th Cir.1995) (applying *Henderson*).

### 2. *ADEA and ORS Chapter 659 Retaliation Claims*

█ In addition to prohibiting unlawful discrimination, the ADEA also makes it unlawful for an employer to discriminate against an employee for opposing unlawful age discrimination. 29 USC § 623(d). In order to state a *prima facie* case of retaliation, the plaintiff must show that he engaged in a protected activity, that the employer subjected him to adverse employment action, and that there is a causal link between his protected activity and the employer's action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987).

█ Oregon law also prohibits retaliation for opposing unlawful age discrimination. ORS 659.030(1)(f). A plaintiff seeking to establish a *prima facie* case of retaliation under ORS Chapter 659 must establish the same elements as are required under the ADEA, namely that he engaged in protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action. *Harris v. Pameco Corp.*, 170 Or. App. 164, 178–79, 12 P.3d 524, 533 (2000).

### 3. *Wrongful Discharge Claim*

█ Pascoe also alleges a claim for wrongful discharge. In Oregon, the tort of wrongful discharge is a narrow exception to the at-will employment doctrine allowed in certain limited circumstances to deter conduct that is contrary to public policy. *See Walsh v. Consolidated Freightways, Inc.*, 278 Or. 347, 350–51, 563 P.2d 1205, 1207–08 (1977). "Oregon courts have identified two circumstances that implicate this tort: (1) discharge for exercising a job-related right of important public interest, and (2) discharge for complying with a public duty." *Draper v. Astoria Sch. Dist. No. 1C*, 995 F.Supp. 1122, 1127 (D.Or.1998) (citations omitted). Complaining about unlawful discrimination falls into the first of these two categories. *Holien v. Sears Roebuck & Co.*, 298 Or. 76, 689 P.2d

---

**4.** Mentor Graphics argues that this court is required to apply the burden-shifting standard based on *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080 (2001). However, *Snead* applies to cases premised upon diversity jurisdiction and arguably does not apply when the court has federal question jurisdiction over an ADEA claim and simply supplemental jurisdiction over a state claim, as here. In any event, as discussed below, the difference is academic in this case since Pascoe satisfies a *prima facie* case and has proffered reasons to disbelieve Mentor Graphics' alleged legitimate reason. This is sufficient under *Reeves* (for ADEA claims) and sufficient under *Henderson* (for state claims).

1292 (1984). As with a retaliation claim, a plaintiff is required to show a causal connection between the exercise of the employment-related right (opposing the discrimination) and the adverse employment action (the discharge). *Shockey v. City of Portland,* 313 Or. 414, 422–23, 837 P.2d 505, 509–10 (1992), *cert denied,* 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993).

## B. Analysis—Age Discrimination Claims

### 1. Adverse Employment Actions Underlying Pascoe's Claims

As a preliminary matter, it is necessary to clarify the adverse employment actions which may form the basis of Pascoe's age discrimination claims. Both the ADEA and ORS Chapter 659 expressly prohibit employers from discharging or refusing to hire an individual because his age. 29 USC § 623(a)(1); ORS 650.030(1)(a). Thus, an age-based discharge or refusal to hire constitutes a sufficient adverse employment action to support claims under those statutes. Similarly, both the ADEA and ORS Chapter 659 make it unlawful to discriminate against protected individuals in the compensation, terms, conditions, or privileges of employment. 29 USC § 623(a)(1); ORS 659.030(b). Thus, adverse actions other than a discharge or refusal to hire may also constitute adverse employment actions under those statutes. However, not every action by an employer is and adverse employment action.

Pascoe specifically alleges that Mentor Graphics intentionally discriminated against him because of his age by first discharging him and later refusing to re-hire him. Complaint, ¶¶ 9–10. His Complaint does not specifically reference the 1999 Performance Review or Mentor Graphics' lack of assistance in finding him alternative employment. However, at oral argument, Pascoe's counsel indicated that Pascoe's substantive claims for age discrimination (under both the ADEA and Oregon law), retaliation (under both the ADEA and Oregon law), and wrongful discharge (under Oregon law) are based on three separate acts, namely: (1) the 1999 Performance Review; (2) his termination; and (3) the refusal to rehire him into another position. In addition, the record contains some discussion of the lack of assistance provided by Mentor Graphics' staffing department in finding Pascoe another position, separate and apart from Mentor Graphics' alleged failure to rehire him. Plaintiff's Concise Statement of Material Facts in Opposition to Defendant's Motions for Partial Summary Judgment, ¶¶ 58–59; Mentor Graphics Corporation's Reply in Support of Its Motions for Partial Summary Judgment Pursuant to FedRCivP 56, pp. 10–11.

While it is clear that Pascoe's age discrimination claims may be based on his termination and Mentor Graphics' refusal to rehire him, they may not be based on the 1999 Performance Review or the alleged lack of assistance in finding alternative employment.

■ A negative performance evaluation (such as Pascoe's 1999 Performance Review) that does not remain in the employee's file or result in some other tangible employment harm is not an adverse employment action. *See Kortan v. California Youth Auth.,* 217 F.3d 1104, 1112–13 (9th Cir.2000). The 1999 Performance Review is suspect because it was undertaken just before Pascoe was terminated and was not completed in accordance with Mentor Graphics' policies. In addition, Pascoe is one of only two (out of a total of nine) Lange subordinates who even received a 1999 Performance Review. In contrast, the only other 1999 Performance Review for Lange's subordinates was apparently completed in accordance with

Mentor Graphics' policies. That performance Review was for Barrett, who was 38 years old at the time. Plaintiff's Exs 129, 153–157, 165–167. Pascoe also has submitted evidence that the rankings from the 1999 Performance Review were made known to Hansen, a member of the staffing department charged with assisting Pascoe in his job search.

However, at oral argument, Mentor Graphics' counsel indicated that the 1999 Performance Review was not put into Pascoe's personnel file and that the Rebalance Plan, which incorporated the rankings contained in the 1999 Performance Review, was confidential. If so, then no hiring managers would have seen the 1999 Performance Review or the Rebalance Plan. Pascoe has submitted no contrary facts. As a result, he may not premise a claim for age discrimination solely on his 1999 Performance Review. *Kortan,* 217 F.3d at 1112–13.

Nevertheless, the information concerning the apparent irregularity and timing of Pascoe's 1999 Performance Review is evidence which may support an inference that it was orchestrated to support Pascoe's termination and may have influenced Pascoe's inability to find another job at Mentor Graphics. Thus, the evidence concerning the creation and distribution of the 1999 Performance Review is relevant to bolster Pascoe's claims of discrimination based on his termination and refusal to rehire.

The Complaint fails to allege, and Pascoe does not argue, that any alleged failure by Mentor Graphics to assist him in finding outside employment supports an independent age discrimination claim. Therefore, this court assumes that Pascoe does not offer that failure as an adverse employment action. As with the evidence concerning the 1999 Performance Review, evidence concerning Mentor Graphics' "proactive" recruitment of rebalanced employees is relevant to prove that, absent discrimination against him, he would have normally been rehired by Mentor Graphics.

## 2. *Prima Facie Case*

■ For purposes of its motion for summary judgment, Mentor Graphics does not dispute that Pascoe was within the class protected by the ADEA and ORS Chapter 659 or that he was qualified for his job. Thus the only question is whether Pascoe has presented evidence that Mentor Graphics' decisions to terminate and not rehire him took place under circumstances giving rise to an inference of unlawful discrimination. Mentor Graphics' motion centers on three main arguments, namely that: (1) Chern did not know Pascoe's age at the time he decided to eliminate Pascoe's position; (2) Pascoe has failed to show that his job was not in fact eliminated; and (3) insufficient evidence supports an inference of unlawful discrimination. However, this court finds that Pascoe has presented sufficient evidence to both establish his *prima facie* case on his age discrimination, retaliation, and wrongful discharge claims, and to raise a genuine issue of material fact as to the truth of the proffered reasons for the rebalance and refusal to rehire. This court therefore recommends denial of Mentor Graphics' motion for summary judgment insofar as it is directed at Pascoe's first three substantive claims.

Because Pascoe's termination was part of a rebalance of the AMS Group, Mentor Graphics acknowledges that Pascoe's age discrimination claims are properly analyzed by reference to those cases involving a reduction in force ("RIF") instituted by the defendant-employer. Those cases do not require the plaintiff to show that his position remained after the RIF. Instead, the plaintiff must simply show either that

his duties were still being performed or that substantially younger employees were treated more favorably. *O'Connor*, 517 U.S. at 312–13, 116 S.Ct. 1307; *Nidds*, 113 F.3d at 917; *Washington*, 10 F.3d at 1433–34. As discussed below, Pascoe has met the minimal *prima facie* burden with respect to his termination and Mentor Graphics' later refusal to rehire him.

### a. *The Rebalance Plan and Resulting Termination*

### i. *The Timing of Chern's Decision*

The main thrust of Mentor Graphics' motion is that Chern did not know Pascoe's age at the time he decided to eliminate Pascoe's position. This argument hinges on Mentor Graphics' assertion that Chern decided to eliminate Pascoe's position in February 2000 (Chern Depo, pp. 39, 79–80; Chern Dec, ¶ 3) before he had a face-to-face meeting with Pascoe. The difficulty with this argument is contrary evidence that Chern's decision to eliminate Pascoe's position was not finalized until considerably later.

An HR employee had prepared a Rebalance Summary Sheet concerning Pascoe as early as February 29, 2000, which indicates that Chern had at least discussed a rebalance of Pascoe's position with HR by that time. Plaintiff's Ex 117. However, no evidence in the record reveals that any further action was taken on the proposed rebalance for nearly six weeks following preparation of the Rebalance Summary Sheet. The next document discussing the rebalance is Christianson's April 19, 2000 e-mail message to Kenny and Hansen (copied to Chern) which indicates that Chern had "recently revisited" the list of roles he thought were not needed. Plaintiff's Ex 118. Nothing in the record explains that comment. However, following his return from France, Chern had a face-to-face meeting with Pascoe, and at that meeting, Chern treated Pascoe much dif-

ferently than during their telephone conversation. Pascoe attributes the difference in treatment to Chern's discovery of his age by observing his aging face, thinning white hair and white beard.

The record does not pinpoint the exact date of Chern's meeting with Pascoe. However, assuming that it took place some time prior to April 19, 2000, the fact that Chern had made a "recent" decision to "revisit" the issue of unneeded roles gives rise to the inference that Chern's decision may have been prompted by his observations during his meeting with Pascoe. This inference is bolstered by the complete lack of documentary evidence indicating that Chern had done anything to finalize his decision to eliminate Pascoe's position prior to mid-April 2000. Furthermore, Chern would have had no reason to meet with Pascoe to discuss his current projects if he had already decided to eliminate Pascoe's position. This inference, which Pascoe is entitled to have drawn in his favor, prevents Mentor Graphics from obtaining summary judgment simply on the basis of its assertions that Chern made the decision to eliminate Pascoe's position without being aware of Pascoe's age.

### ii. *Evidence Giving Rise to an Inference of Discrimination*

The record also contains evidence from which a fact-finder could infer both that Pascoe's duties were still being performed after his termination and that substantially younger Mentor Graphics' employees were treated more favorably. Within a week after being notified of his termination, Chang was actively trying to relocate El-Hak into the United States where he would "pick up the CommLib support," one of Pascoe's projects. Plaintiff's Ex 124. Later, when El-Hak did not relocate, Bakalar was given responsibility for CommLib. Pratt Depo, p. 37. Mentor Graph-

ics insists that El–Hak, a TME, was going to "pick up" only the technical support for the CommLib project, and not any product marketing functions that Pascoe had performed. However, Pratt specifically testified that in the latter part of 2000, Bakalar became the "product manager" for CommLib. Pratt Depo, p. 37.

In addition, Pascoe has presented evidence that substantially younger employees were not slated for a rebalance. Which "six" Product Managers Chern intended to reduce to three is unclear. Chern Depo, p. 79; Chern Dec, ¶¶ 3–4. But at the time of the rebalance, the bulk of the employees in the AMS Group were under the age of 40, and the vast majority of those were substantially younger than Pascoe. Plaintiff's Ex 129. Not all of those employees were in Pascoe's "group" (*i.e.* Szij was in Koeroghlian's group when Koeroghlian asked her for information regarding Pascoe's 1999 Performance Review). At any rate, of the 11 employees in the AMS Group (including Pascoe and Walton) with job titles of Program Manager, Product Marketing Manager, Marketing Director, or Market Development Director, only four (including Pascoe and Walton) were over the age of 40 as of May 2000. Plaintiff's Ex 129. The rebalance was directed only at the two employees over the age of 40, Pascoe and Walton. *Id.* Moreover, in June 2000, Pascoe (at age 62) was more than 20 years older than all but one of those employees (with the lone exception being Bakalar, who was 50 years old at that time). Thus, Pascoe satisfies his *prima facie* case as to the rebalance resulting in his termination.

### b. *Failure to Rehire*

By mid–1998, Mentor Graphics had a proactive approach to finding alternative employment with Mentor Graphics for rebalanced employees. Hansen Depo, p. 41. Despite that approach, Pascoe was categorically rejected from two positions as a TME within a month of being terminated. Between January 1994 and April 1998, Pascoe worked as a TME for Mentor Graphics and received high rankings in his Performance Reviews. Pascoe Dec, ¶ 31; Plaintiff's Exs 104–112. However, rather than rehire Pascoe for the open TME position in Pratt's group, Mentor Graphics first opted to transfer M'Kalech (a 26 year old TME from Egypt) into that position, and a short time later transferred M'Kalech to France and hired Mayer (a 27 year old outside hire) as his replacement. Rather than rehire Pascoe for the TME position with Dhar, Mentor Graphics hired Chan, a 35 year old who had formerly been a TME with Mentor Graphics and terminated for poor performance some time between 1996 and 1998 when Cao was Pascoe's supervisor. Pascoe has submitted evidence that he was equally or more qualified for the open TME positions as M'Kalech, Mayer, or Chan, and has thereby met his *prima facie* burden.

### 3. *Legitimate Nondiscriminatory Reasons Proffered by Mentor Graphics*

■ Because Pascoe has met his *prima facie* burden of establishing a claim for age discrimination, the burden shifts to Mentor Graphics to articulate a legitimate reason for its actions.

### a. *The Rebalance and Resulting Termination*

Mentor Graphics has submitted evidence that Pascoe's termination was simply part of a rebalance of the AMS Group. According to Mentor Graphics, the rebalance was designed to combine product-marketing functions and reduce the number of product-marketing positions, add TME positions, reduce the number of Mentor Graphics products, and solve the problem that no product managers were in Silicon

Valley. Chern Dec, ¶ 2–3; Chern Depo, pp. 39, 75, 79–80. Mentor Graphics has therefore met its burden of proffering a legitimate, nondiscriminatory reason for the rebalance and Pascoe's termination.

### b. *Failure to Rehire*

Mentor Graphics insists that the decision not to hire Pascoe for the open TME positions had nothing to do with age discrimination. Instead, Mentor Graphics maintains that the hiring decisions to fill openings in both Pratt's and Dhar's groups were made by Chang. Chang claims that he had no knowledge of any age discrimination claims by Pascoe and simply did not want to hire Pascoe because he had submitted questionable expense reports. Thus, Mentor Graphics has met its burden of proffering a legitimate, nondiscriminatory reason for refusing to rehire Pascoe.

### 4. *Pretext*

■ Because Mentor Graphics has met its burden of articulating legitimate non-discriminatory reasons for its actions, it is entitled to summary judgment unless the evidence proffered by Pascoe "raises a genuine issue of material fact regarding the truth of the employer's proffered reasons" or Pascoe submits other evidence that the proffered reasons are a pretext for unlawful discrimination. *Chuang,* 225 F.3d at 1127 (citation omitted). The ultimate issue with respect to each allegedly adverse action about which Pascoe complains is whether sufficient evidence in the record shows that the action occurred under circumstances giving rise to an inference of unlawful age discrimination. *Reeves,* 530 U.S. at 153, 120 S.Ct. 2097. More specifically, how is it that within the course of six months, Pascoe went from being a project manager with an eight year history of consistently high rankings to being ranked NIC and handed the proverbial pink slip? Is there sufficient evidence from which a fact-finder could con-

clude that his age, or his complaints about age discrimination, played a role, or was this change simply due to a change in management and a straightforward business restructuring with no hidden agenda?

Mentor Graphics contends that two individual supervisors, Chern and Chang, made independent decisions to eliminate Pascoe's position and not rehire him and that no evidence links those decisions to discriminatory treatment or to Pascoe's complaints of age discrimination. According to Mentor Graphics, Chern—and Chern alone—who made the decision to terminate Pascoe without knowledge of Pascoe's age or discrimination complaints. Similarly, Mentor Graphics contends that Chang—and Chang alone—who made the decision to not rehire Pascoe into one of the open TME positions based on his concerns about Pascoe's questionable expense reports.

This contention depends largely on the testimony of Chern and Chang. If nothing in the record contradicted their testimony, then Pascoe would be hard-pressed to establish that his termination and rejection for other positions took place under circumstances giving rise to an inference of age discrimination. However, some evidence in the record calls the credibility of these witnesses into question, thereby making summary judgment inappropriate as to both the termination and decision not to rehire Pascoe.

### a. *The Rebalance and Termination*

As discussed above, in November 1999, Lange told Pascoe he "should not be surprised if [his 1999] performance review is not good." Plaintiff's Ex 115, p. 2. In December 1999, Pascoe complained to Kenny of age discrimination by Lange and specifically mentioned Lange's warning. Plaintiff's Ex 115, p. 2. By the end of 1999, Koeroghlian also knew of problems be-

tween Pascoe and Lange. Koeroghlian Depo, p. 22.

Shortly after Chern's arrival in January 2000, Lange was terminated, in part based upon his ageist comments to Pascoe. By February 2000, Pascoe had told Rodriguez (Lange's supervisor) about his age discrimination complaint to Kenney. The Rebalance Plan, under construction during the critical months between January and April 2000, specifically notes that a "red flag" as to age discrimination with regard to Pascoe. Also during that critical time and seemingly in fulfillment of Lange's threats that Pascoe should not be surprised if he received a bad 1999 Performance Review, Koeroghlian, at Christianson's urging, prepared the 1999 Performance Review giving Pascoe an unprecedented NIC ranking.

Based on this record, a fact-finder could well conclude that Pascoe's termination had everything to do with age discrimination. Chern "revisited" the issue as to what positions were not needed after his face-to-face meeting with Pascoe, when Pascoe contends that Chern's treatment of him changed. The 1999 Performance Review was initiated by Christianson (who was apparently the individual responsible for facilitating Chern's rebalance plan) and completed during the same critical time period. Pascoe was one of only two Lange subordinates who was even reviewed, and his 1999 Performance Review (unlike the review of Barrett) was prepared in utter disregard of Mentor Graphics' policies. Moreover, despite Christianson's apparent knowledge of "difficulty" getting information to complete the 1999 Performance Review (Plaintiff's Ex 117), the NIC ranking of Pascoe made its way into the Rebalance Plan. Plaintiff's Exs 119–20.

While it is possible to explain away this evidence, when viewed in the light most favorable to Pascoe, it is sufficient to give rise to inference that the 1999 Performance Review was simply generated in an effort to justify Pascoe's termination. And while a fact-finder may well believe Chern that he had no underlying discriminatory motive, inconsistencies in his testimony discussed below, when viewed in the light most favorable to Pascoe, provide a basis to disbelieve him and instead conclude that the rebalance was a calculated effort to cull out Pascoe.

First, Chern's testimony that he was unaware of Pascoe's age and complaints of age discrimination is somewhat suspect. He certainly knew what Pascoe looked like by mid-April when he "revisited" the issue of what jobs to eliminate. And surely he knew something about the circumstances surrounding Lange's departure, given that everyone else did and given that he hired Chang in mid-March 2000 to replace Lange. Although Chern did not attend the ranking meeting in January, Christianson did and she worked with Chern on the Rebalance Plan. Chern did not prepare Pascoe's 1999 Performance Review and testified that he did not read the "red flag" regarding age discrimination in the Rebalance Plan. However, Kenny and Rodriguez were aware of Pascoe's age discrimination claim (as the court must assume for purposes of the present motion). Thus, it is reasonable to infer that Chern was also aware of it.

Second, while the record contains no evidence that Chern made any ageist comments prior to notifying Pascoe of the Rebalance Plan, Pascoe testified to a complete turnaround in the treatment he received from Chern after Chern observed his aging face and white hair. Moreover, within a month after Pascoe's termination, in response to an inquiry from Youngs about Pascoe applying for the position as a TME in Dhar's group, Chern responded that he wanted to "upgrade." Youngs Depo, p. 22. This comment seriously undercuts Chern's testimony that his decision

was designed to eliminate Pascoe's position rather than Pascoe himself. And the comment itself is sufficiently ambiguous to permit the inference that Chern preferred a younger employee.

Third, the record also contains evidence which could lead a fact-finder to disbelieve Chern's testimony about the necessity or reasons for the rebalance. Specifically, Chern states that the rebalance was, in part, necessary in order to solve the problem that no product managers were in the Silicon Valley, the largest market for Mentor Graphics' products. Chern Dec, ¶ 2. However, to solve that problem, Chang relocated El–Hak (a TME in Egypt) to San Jose, in part to pick up the CommLib project that had been part of Pascoe's job. Plaintiff's Ex 124. El–Hak did not relocate and instead Bakalar (in Maryland) was given responsibility for CommLib. Pratt Depo, p. 37. Assigning those responsibilities to Bakalar who remained in Maryland is arguably inconsistent with the goal of having a product manager in the Silicon Valley. Pascoe was not even offered an opportunity to move to San Jose.

Even without these inconsistencies, a jury arguably would be at liberty to reject Chern's testimony. " '[W]e point out that in this Circuit (as in others) the rule is that the trier of fact is at liberty within the bounds of reason to reject entirely the uncontradicted testimony of a witness which does not produce conviction in his mind of the witness' testimony.' " *White Glove Bldg. Maintenance, Inc. v. Brennan*, 518 F.2d 1271, 1274 (9th Cir.1975), quoting *Joseph v. Donover Co.*, 261 F.2d 812, 824 (9th Cir.1958). *See also, City of Portland v. BOLI*, 298 Or. 104, 116 n. 6, 690 P.2d 475, 482 n. 6 (1984) ("Where the credibility of witnesses is concerned, the trier of fact is not necessarily bound by uncontradicted testimony, for the trier of fact may simply not believe the witnesses."). Because Mentor Graphics' motion against the claim

based on the rebalance hinges on Chern's credibility, evidence contradicting Chern's testimony defeats summary judgment as to those claims.

#### b. *The Failure to Rehire*

Similar inconsistencies prevent summary judgment on the claims based on the refusal of Mentor Graphics to rehire Pascoe. Mentor Graphics takes the position that Chern was not involved in the decision to refuse to rehire Pascoe, but the record contains contradictory evidence. Chern testified that he let Chang make the decision. Chern Depo, pp. 67–69. However, Chang sent an e-mail to Pratt indicating that he would have to clear the decision with Chern. Plaintiff's Ex 123. Additionally, Chang testified that he at least ran the reason for his decision by Chern, even if he ultimately was the individual to whom the decision not to rehire was attributed. Chang Depo, p. 58. This is contrary to Chern's testimony that no one ever told him anything negative about how Pascoe performed his job (Chern Depo, p. 108), and that no one ever talked to him about Pascoe getting another position with Mentor Graphics. Chern Depo, p. 136.

Chang claims that his decision not to rehire Pascoe was based on his conclusion that Pascoe had submitted questionable expense reports and was not trustworthy. However, his e-mail messages at the time of his decision not to rehire Pascoe said nothing about that. Instead, they questioned Pascoe's ability to be "proactively" involved in customer issues and asked whether this was just his "bias." Plaintiff's Ex 123. If Chern really was sufficiently concerned about Pascoe's trustworthiness, one could question why he sent e-mail messages back and forth to Pratt asking Pratt to find out whether Pascoe was interested (indicating that he might

consider hiring him), but that he would have to "convince" Chern.

Chang also claims he told Pratt about his decision not to rehire Pascoe (Chang Depo, p. 48), while Pratt maintains that he never got a response to his suggestion that Pascoe be hired and does not know why Pascoe wasn't hired. Pratt Depo, p. 61.

Another document in the record supporting Pascoe's claim is Christianson's April 19, 2000 e-mail to Kenney, Hansen, and Chern. That e-mail states that Christianson would share via voice mail: (1) data regarding "some background work that was needed during the Focal process due to the departure of both [Rodriguez] and [Lange]" and (2) information "about where I have floated the prospect of placement of one of the incumbents." Plaintiff's Ex 118. This begs the question as to what information was "needed" and why Christianson floated the prospect of placement of only *one* of the incumbents?

Chang has offered a reason for refusing to rehire Pascoe which is, on its face, legitimate. Chern has disclaimed any responsibility for making the decision(s) not to rehire Pascoe. However, contradictory evidence in the record could lead a fact-finder to disbelieve Chang and instead conclude that he decided not to rehire Pascoe was based on his age rather a supposed concern over his trustworthiness. Viewed in Pascoe's favor, the evidence supports the conclusion that Pascoe's long-standing history of good performance reviews and his four-plus years of experience as a TME for Mentor Graphics between January 1994 and April 1998, made him an ideal candidate for a position as a TME in the AMS Group, which is the same conclusion reached by others in Chern's group. Thus, summary judgment as to these claims is inappropriate.

## C. *Analysis—Retaliation & Wrongful Discharge*

■ Mentor Graphics also moves for summary judgment against Pascoe's claims for retaliation and wrongful discharge based on the lack of a causal link between his protected activity (the complaints of discrimination to Kenney in December 1999 and to Rodriguez in February 2000) and the adverse actions (his termination and Mentor Graphics' failure to rehire him). However, Mentor Graphics' arguments regarding the lack of causation are based on the same premise as its arguments concerning Pascoe's disparate treatment claims, namely that (1) Chern alone made the decision to terminate Pascoe prior to knowing Pascoe's age or about his complaints of discrimination; and (2) Chang alone made the decision not to rehire Pascoe and did not know about Pascoe's complaints.

For the same reasons discussed above, there is sufficient evidence in the record from which a fact-finder could infer that Chern was both aware of Pascoe's complaints of discrimination and was responsible both for the decision to terminate Pascoe and to exclude him from consideration for other open positions. For these same reasons, summary judgment against Pascoe's retaliation and wrongful discharge claims should be denied.

## IV. *Wage Claim Penalties*

Mentor Graphics also moves for partial summary judgment against several of the types of relief Pascoe seeks in his Third Claim for Relief. In that claim, Pascoe seeks to recover: (1) a civil penalty under ORS 653.055 for failure to pay minimum wages as required by ORS 653.025; (2) a civil penalty under ORS 652.150 for failure to pay his wages by the end of the next business day after his termination as required by ORS 652.140(1); and (3) liqui-

dated damages for failure to pay minimum wages under the Fair Labor Standards Act ("FLSA"), 29 USC § 216(b).

Mentor Graphics asserts that because all three penalties stem from one incident, Pascoe should be limited to a single penalty. Pascoe contends that all three penalties are recoverable. Because the facts are undisputed, Pascoe made an oral cross-motion for partial summary judgment.

## A. *Undisputed Facts*

It is undisputed that on his last day of work for Mentor Graphics, June 12, 2000, Mentor Graphics gave Pascoe a single check in the amount of $25,087.84, which included his wages for June 1–12, 2000, accrued vacation and sick times through June 12, 2000, and severance payment equal to four months' salary. Kenney Dec, ¶ 7. Acceptance of the severance payment was conditioned on Pascoe's agreement to a release of claims against Mentor Graphics. Plaintiff's Ex 126. Pascoe did not negotiate the June 12, 2000 check and did not sign the release. Had Pascoe negotiated the June 12, 2000, check, then Mentor Graphics could have argued that Pascoe had accepted the severance payment and waived his claims. On August 31, 2000, Mentor Graphics tendered a second check to Pascoe's attorney for only Pascoe's final wages owing and his accrued flexible time off. Plaintiff's Ex 127.

## B. *Violation of ORS 652.140 (Late Payment)*

Mentor Graphics conceded at oral argument that its tender of the June 12, 2000 check for both wages and severance pay did not constitute payment of Pascoe's wages earned and unpaid by the end of the next business day after Pascoe's termination. Thus, Mentor Graphics violated ORS 652.140 which requires payment of all wages within one business day after termination. The penalty for violating ORS 652.140 is set forth in ORS 652.150 and is equal to the employee's wages from the due date until paid, up to a maximum of 30 days. The clock continued to tick until August 31, 2000, when Mentor Graphics tendered an unconditional payment of Pascoe's final wages, well after the period prescribed by ORS 652.140. Therefore, Pascoe is entitled to recover the maximum civil penalty under ORS 652.150.

## C. *Violation of FLSA Minimum Wage Provision*

■ Although Pascoe eventually received payment of his regular wages, which exceeded the minimum wage, he contends that Mentor Graphics also violated the FLSA minimum wage provision. The FLSA provides that "[e]very employer shall pay to each of his employees ... who in any workweek is engaged in commerce or in the production of goods for commerce ... not less than the minimum wage." 29 USC § 206(b). The FLSA does not specify when this wage must be paid. However, the Ninth Circuit has held that wages are considered unpaid, and a minimum wage not received under the FLSA, if wages are not paid on the employee's regular payday. *Biggs v. Wilson,* 1 F.3d 1537 (9th Cir.1993), *cert denied,* 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 94(1994) (holding that California violated the minimum wage provisions of the FLSA by paying wages 14–15 days late due to a budgetary impasse in the State legislature). Mentor Graphics set paydays on the closest business day to the 15th and the last day of the month. Thus, Pascoe's next payday after his termination was June 15, 2000. Because Mentor Graphics paid Pascoe's wages on August 31, 2000, and not by his regular payday, it violated 29 USC § 206, entitling Pascoe to liquidated damages as provided under 29 USC § 216.

**1062**

### D. *Violation of ORS 653.055 (Minimum Wage)*

ORS 653.055 also requires payment of a minimum wage, but does not specify when that payment is due. However, ORS 652.120 requires employers to set a regular payday and prohibits employers from setting a regular payday more than 35 days beyond the date of the last regular payday. Following the rationale of *Biggs* with respect to the FLSA, Pascoe contends that Mentor Graphics was required to pay him a minimum wage required by ORS 653.055 by at least his next regular payday.

The reasoning of *Biggs* is persuasive since there must be some date on which the minimum wage is considered unpaid. However, the Oregon Court of Appeals has noted that "*Biggs* has not met with wide acceptance among other federal courts that have considered similar questions," citing *Rogers v. City of Troy*, 148 F.3d 52 (2nd Cir.1998). *Hurger v. Hyatt Lake Resort, Inc.*, 170 Or.App. 320, 328, 13 P.3d 123, 127 (2000), *rev denied*, 331 Or. 583, 19 P.3d 355 (2001). Unfortunately, *Hurger* found it unnecessary to address *Biggs* since its decision "would be adverse to plaintiffs even if we found *Biggs* to be apposite and its holding correct," given that plaintiffs made no contention that they were not paid by their regular payday. *Id.*

■ Despite criticism of *Biggs* by the Oregon Court of Appeals, this court is persuaded that *Biggs* is correct in the context of this case. Although the FLSA does not explicitly require that wages be paid on time, courts have long interpreted the statute to include a prompt payment requirement. *See, e.g., United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 491 (2nd Cir.1960) ("While the FLSA does not expressly set forth a requirement of prompt payment, such a requirement is clearly established by the authori-

ties . . . ."). Moreover, in *Hurger*, the Oregon Court of Appeals did not reject *Biggs*, but merely distinguished it from the situation in which an employer changes its pay schedule. Therefore, this court concludes that, just as under the FLSA, Oregon's minimum wage provision is violated if the minimum wage is not paid by the next regular pay date, or in this case, by June 15, 2000. Since Mentor Graphics did not pay Pascoe's wages by that date, it violated ORS 653.055. The penalty for that violation is the same as provided in ORS 652.150, namely 30 days wages.

### E. *Recovery of Multiple Penalties*

■ Nonetheless, relying on *Hurger*, Mentor Graphics argues that imposition of these three penalties constitutes an impermissible triple recovery for one course of conduct, namely a late payment of wages. In *Hurger*, former employees alleged that their employer did not pay wages until two weeks after the time allowed by ORS 652.140. When the wages were paid, however, they complied with the minimum wage requirements. The court disallowed recovery of both a penalty for violation of the minimum wage statute, ORS 653.055, and a penalty for not paying wages within one business day after termination as required by ORS 652.140. It explained:

> When, as here, the employee's regular wage rate complies with the statutory minimum requirement, the minimum wage component is automatically subsumed within the wage rate on which the penalty under ORS 652.150 is computed for the violation of ORS 652.140 itself. To impose a separate penalty under ORS 652.150, under these circumstances, would constitute a second penalty based on an amount that has already been included in the penalty that the employee has recovered for the untimeliness of the final payment under ORS 652.140.

*Id,* 170 Or.App. at 326, 13 P.3d 123 (emphasis added).

Plaintiff correctly notes that *Hurger* did not involve the situation involved in this case in which the employee was not paid by his next regular pay date. *Hurger* clearly limited its holding to the situation where the employee's minimum wage claim is premised *solely* on a violation of ORS 652.140 (requiring payment of wages within one business day from termination) and left open the situation presented by Pascoe:

> It is possible that a payment that is "late" for purposes of ORS 652.140 can also be "late" for purposes of other statutes. Here, for example, the parties do not apprise us whether plaintiffs' wages, aside from being untimely under ORS 652.140, were or were not paid by the next regular payday established in compliance with ORS 652.120. It is unnecessary for us to resolve that question because plaintiffs do not rely on any theory of an untimely payment that violates the minimum wage statutes except their theory that an untimely final payment under ORS 652.140 is, *per se,* also a violation of the minimum wage statute.

*Id,* 170 Or.App. 320, 326 n. 2, 13 P.2d 126 n. 2.

Contrary to the plaintiffs in *Hurger,* Pascoe not only received a late payment under ORS 652.140, but *also* was not paid by his next regular pay date. This latter failure is a separate violation which would, in and of itself, allow for the recovery of a penalty for failure to pay minimum wages under ORS 653.055. Since Mentor Graphics failed to pay him *any* wages by his next regular payday, June 15, 2000, *Hurger* does not foreclose imposition of a penalty for violating both ORS 652.140 and 653.055, and, in fact, seems to support the imposition of both penalties.

 However, recovery of penalties under both Oregon law and the FLSA for failure to pay a minimum wage is cumulative. In *Allen v. WTD Indus.,* Case No. 99–249–RE (DOr Oct. 11, 2000), Judge Redden found that the plaintiffs could assert both a FLSA and state claim for overtime violations, but limited recovery to "whatever amount is greater under one statute or the other." *Id,* slip op at 11. Judge Redden reasoned that "[t]his prevents the imposition of multiple penalties on an employer for a single course of conduct." *Id.* The same reasoning should apply here. While Pascoe may allege both an FLSA and a state claim for failure to pay a minimum wage, he may not recover penalties under both.

Accordingly, Pascoe should be granted summary judgment against Mentor Graphics for penalties **both** for violating ORS 652.140 and for violating **either** the FLSA minimum wage provision **or** ORS 653.055, with the second penalty limited to whatever amount is greater under the FLSA or ORS 652.150 (the penalty provision for violating ORS 653.055).

### RECOMMENDATIONS

For the reasons stated above, Mentor Graphics' Motion for Partial Summary Judgment (docket # 25) should be DENIED, and Pascoe's oral Motion for Partial Summary Judgment as to the Third Claim For relief should be GRANTED for penalties **both** for violating ORS 652.140 and for violating **either** the FLSA minimum wage provision **or** ORS 653.055, with the second penalty limited to whatever amount is greater under the FLSA or ORS 652.150 (the penalty provision for violating ORS 653.055).

### SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due **November 27, 2001.** If no objections are filed, then the Findings and Recommendation(s) will

be referred to a district court judge and go under advisement on that date.

If objections are filed, the response is due no later than **December 14, 2001.** When the response is due or filed, whichever date is earlier, the Findings and Recommendation(s) will be referred to a district court judge and go under advisement.